1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

10  TODD LEHTONEN, TRUSTEE OF THE
    PURCHASPRO.COM, INC.
11  LIQUIDATING TRUST,

12          Plaintiff,

13  v.

14  GATEWAY COMPANIES, INC., et al.,

15          Defendants.

Case No. 2:04-CV-0625-KJD-GWF

**ORDER**

16

17          Currently before the Court is Plaintiff's Motion for Partial Summary Judgment (#134), and

18  Defendant Gateway Companies, Inc.'s ("Gateway") Consolidated Motion for Summary Judgment

19  (#135).  Plaintiff's Motion was filed on November 1, 2006, to which Defendant Gateway responded

20  (#139), and Plaintiff filed a Reply (#144).  Likewise, Gateway's Motion was filed on November 1,

21  2006, to which Plaintiff responded (#140) and Gateway filed a Reply (#145).  Because the Motions

22  at issue involve interrelated allegations, claims, and defenses arising from the same transactions the

23  Court will make a determination regarding both Motions together herein.

24  **I. Background**

25          This case, originally filed in bankruptcy court, involves an action brought by Todd Lehtonen,

26  the Trustee of Purchasepro.com Inc. Liquidating Trust, against Gateway to recover approximately

1  $40 million in damages for the alleged breach of a September 2000 Training and Marketing Services

2  Agreement (TMSA) to provide certain training and marketing services in support of an electronic

3  marketplace that was to be built and maintained by PurchasePro.[1]  As consideration for Gateway's

4  services, PurchasePro delivered stock warrants to Gateway which gave it the right to purchase shares

5  in PurchasePro.  At the time the warrants were delivered to Gateway, PurchasePro's stock allegedly

6  had a value approximately commensurate with the value of the services that were to be provided by

7  Gateway.  Within a few months after the contract was executed, however, the value of PurchasePro's

8  stock sharply declined and Gateway did not perform most of the training and marketing services

9  called for under the contract.

10      It is undisputed by Plaintiff that PurchasePro's officers engaged in fraudulent conduct to

11  misrepresent and conceal PurchasePro's precarious financial condition from its auditors and the

12  general public.  In particular, PurchasePro's officers allegedly concealed from the auditors side-

13  agreements made with customers or partners which made it appear that PurchasePro was generating

14  more revenue than was the case.  If these agreements had been disclosed to the auditors, they would

15  have allegedly rejected or discounted the revenue, thereby revealing to the public PurchasePro's far

16  more precarious financial condition.

---

19  [1]Plaintiff's original Complaint, filed in bankruptcy court, brings claims for breach of contract, breach of the
20  implied covenant of good faith and fair dealing, and turnover of property.  (See #2.)  Moreover, beginning in October ,
   2000, Lehtonen was employed as Vice President and Associate General Counsel for PurchasePro, and ultimately as
21  PurchasePro's General Counsel.  He continued to work for PurchasePro up through its bankruptcy in September 2002,
   then became the "responsible person" for Purchasepro's bankruptcy proceedings, and subsequently became the "Trustee"
22  for what remained of PurchasePro following bankruptcy.  Subsequently, Lehtonen was substituted as Plaintiff in the
   current case, and during discovery, was produced as the person "most knowledgeable" regarding PurchasePro's claims in
23  this lawsuit, PurchasePro's alleged damages, and PurchasePro's performance under the Gateway contracts.  Further, the
   record reflects that during pendency of its bankruptcy, PurchasePro reached a settlement with the U.S. Government
24  whereby PurchasePro agreed to cooperate in the government's ongoing investigations of criminal activity committed by
   PurchasePro's former officers and directors.  In exchange for its cooperation, PurchasePro itself was not prosecuted for
25  any crimes and no monetary claims were asserted against Purchasepro in bankruptcy.  Lehtonen was granted immunity
   from prosecution and testified as a government witness against former PurchasePro officers in their criminal trials.
26  Lehtonen has been identified as the Plaintiff's Rule 30(b)(6) witness in this case, and has confirmed under oath that the
   allegations in the D&O Complaint were true.

2

1

2      Lehtonen's Complaint contains three claims for relief: (1) for breach of the TMSA contract;

3 (2) for breach of the implied covenant of good faith and fair dealing arising from the TMSA; and (3)

4 for the turnover of property to the debtor's bankruptcy estate.  In its answer, Gateway raises twenty

5 affirmative defenses, many of which involve allegations that Plaintiff's causes of action are barred

6 due to PurchasePro's officers' fraudulent conduct and intentional and/or negligent misrepresentations

7 regarding its stock and business.

8      Lehtonen now seeks partial summary judgment on the issue of liability relative to his first

9 claim for breach of contract and third claim for turnover of funds.  Lehtonen  also seeks summary

10 judgment on twelve of Defendant's twenty affirmative defenses.  Particularly, Plaintiff seeks

11 summary judgment on those affirmative defenses grounded in allegations of fraud by PurchasePro.[2]

12      Specifically, Plaintiff argues that Gateway has no defense based on allegations that

13 PurchasePro breached the TMSA contract.  Plaintiff also contends that Gateway has no defense

14 based on allegations for violation of the covenant of good faith and fair dealing because PurchasePro

15 performed its obligation under the TMSA by delivering the warrants, and because all implied

16 warranties or covenants were disclaimed in the contract itself.  Plaintiff further argues that, as

17 liquidation trustee, he is not subject to a defense based on the alleged criminal or inequitable conduct

18 of PurchasePro's officers.  Additionally, Plaintiff argues that Gateway cannot demonstrate frustration

19 of purpose because there was adequate consideration at the time the contract was entered into and

20 because the decline in PurchasePro's stock was caused by the general collapse of the "dot.com"

21 market boom and not by the illegal activity of PurchasePro's officers.  Plaintiff also disputes

22 Gateway's assertions that PurchasePro failed to mitigate its damages by not demanding performance

23 under the TMSA from Gateway, that PurchasePro failed to provide notice of the alleged breach, and

24 that PurchasePro cannot prove its damages for breach of contract.

25

26    [2]Plaintiff seeks summary judgment on Defendant's first, third, ninth, tenth, twelfth, thirteenth, fourteenth, fifteenth, sixteenth, seventeenth, eighteenth, and nineteenth affirmative defenses.

1    Gateway opposes Lehtonen's Motion and seeks summary judgment on each of Plaintiff's

2  causes of action under various theories.  Specifically, Gateway claims that PurchasePro breached the

3  express and implied conditions of the TMSA contract, and that the illegal conduct of PurchasePro's

4  officers was a proximate cause of the decline in its stock value and collapse of the company.

5  Gateway argues that this provides a defense to its obligations under the contract based on

6  PurchasePro's violation of the covenant of good faith and fair dealing and also under the doctrine of

7  frustration of purpose.  Additionally, Gateway alleges defenses based on Plaintiff's failure to mitigate

8  damages and also alleges that Plaintiff has failed to present sufficient evidence of damages resulting

9  from the alleged breach.  Underlying Gateway's defenses is the assertion that PurchasePro was not in

10  a position to receive the training and marketing services from Gateway during the period the TMSA

11  was in effect because PurchasePro's business was collapsing.

12  **II.  Standard of Law for Summary Judgment**

13    Summary judgment may be granted if the pleadings, depositions, answers to interrogatories,

14  and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any

15  material fact and that the moving party is entitled to a judgment as a matter of law.  See Fed. R. Civ.

16  P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party bears the

17  initial burden of showing the absence of a genuine issue of material fact.  See Celotex, 477 U.S. at

18  323.  The burden then shifts to the nonmoving party to set forth specific facts demonstrating a

19  genuine factual issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

20  587 (1986); Fed. R. Civ. P. 56(e).

21    All justifiable inferences must be viewed in the light must favorable to the nonmoving party.

22  See Matsushita, 475 U.S. at 587.  However, the nonmoving party may not rest upon the mere

23  allegations or denials of his or her pleadings, but he or she must produce specific facts, by affidavit

24  or other evidentiary materials provided by Rule 56(e), showing there is a genuine issue for trial.  See

25  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  The court need only resolve factual

26  issues of controversy in favor of the non-moving party where the facts specifically averred by that

4

1  party contradict facts specifically averred by the movant.  See Lujan v. Nat'l Wildlife Fed'n., 497

2  U.S. 871, 888 (1990); see also Anheuser-Busch, Inc. v. Natural Beverage Distribs., 69 F.3d 337, 345

3  (9th Cir. 1995) (stating that conclusory or speculative testimony is insufficient to raise a genuine

4  issue of fact to defeat summary judgment).  "[U]ncorroborated and self-serving testimony," without

5  more, will not create a "genuine issue" of material fact precluding summary judgment. Villiarimo v.

6  Aloha Island Air Inc., 281 F.3d 1054, 1061 (9th Cir. 2002).

7      Summary judgment shall be entered "against a party who fails to make a showing sufficient

8  to establish the existence of an element essential to that party's case, and on which that party will

9  bear the burden of proof at trial." Celotex, 477 U.S. at 322.  Summary judgment shall not be granted

10 if a reasonable jury could return a verdict for the nonmoving party.  See Anderson, 477 U.S. at 248.

11 **III. Analysis and Discussion**

12     As stated above, both parties seek summary judgment among other things, by claiming that

13 the other breached the the TMSA.  Plaintiff claims that Gateway failed to provide services under the

14 TMSA in the form of training and marketing services.  Gateway contends that PurchasePro breached

15 both express and implied terms of the TMSA, and that Plaintiff has failed to demonstrate

16 undisputable facts establishing that Gateway breached the contract, or that  PurchasePro suffered

17 damages due to Gateway's alleged breach.

18 **A. Breach of Contract**

19     Generally, whether facts established by a party constitute a breach of contract is a question of

20 law to be determined by the court, but whether facts sufficient to constitute a breach of contract have

21 been established is ordinarily a question of fact to be determined by the trier of fact.  See CJS

22 Contracts § 780.  Here, the Court finds the undisputed facts established by the parties are sufficient to

23 rule on both parties' breach of contract claims.  First, the Court will consider Plaintiff's allegation

24 that Gateway breached the express terms of the TMSA.

25

26

**1. Gateway's Breach**

Because both parties contend the terms of the TMSA, the Court finds it necessary at this time to examine the subject TMSA agreement for ambiguity, and to determine which terms and obligations are included in the document.  Plaintiff argues that the TMSA's integration clause requires the Court to consider only the obligations contained in the TMSA document itself. Defendant, on the other hand, contends that the TMSA was part of a larger strategic alliance, involving seven other agreements that were allegedly "incorporated into and contemporaneously executed with the TMSA." (Defs.' Opp at 18.)

**a. Integration**

On September 29, 2000, Gateway and PurchasePro entered into the subject TMSA.  On the same day, the parties signed six other documents creating what Defendant refers to as a "strategic alliance." (Defs'. Mot. for Sum. J. at 11; see also Ex. N.)  Through these agreements, PurchasePro was to implement and maintain an electronic marketplace for Gateway that could be used in various global regions, including the United States, Asia, the Pacific, Europe, the Middle East, and Africa. In exchange, Gateway paid PurchasePro $3.3 million in licensing fees, and other monthly fees. Gateway claims that the TMSA was a part of the strategic alliance between the companies that was to last for a period of two years, from September 29, 2000, to September 29, 2002.  (Def.'s Mot. for Summ. J. at 12.)

In opposition, Lehtonen argues that the integration clause of the TMSA eliminates the reference to any other agreement, including the agreements related to the strategic alliance or global marketplace, and that Defendant cannot look to PurchasePro's performance under the separate "strategic alliance" agreements "as a basis for avoiding its obligations under the TMSA." (Pl.'s Reply at 2.)  Lehtonen argues that PurchasePro performed its obligation under the contract by delivering the warrants as outlined in the TMSA.

 The integration clause of the TMSA to which Lehtonen refers, states,

> [t]he Agreement and any attached Exhibits contain the entire agreement of the parties
> and supercede any and all prior representations or agreements, whether oral or written,
> relating to the subject matter of the Agreement.

(See Def's Opp. at Ex. N. Bate Stamp PPRO000501142.)  The agreement then provides a list of exhibits "attached and made part of [the] Agreement," and lists: "Maximum Values for Services (Exhibit A); Phase I Warrant (Exhibit B-1); Phase II Warrant (Exhibit B-2); and Marketplace Warrant (Exhibit B-3)."  Id.

The TMSA contains a choice of law provision stating that the agreement "shall be governed by and in accordance with the laws of the state of New York." (TMSA § 16.)  Further, neither party contends that New York law should not be applied in this case.  Under New York law, multiple agreements executed as part of the same transaction may be considered together as one agreement, but only if the agreement indicates that the parties intended the agreements to be integrated.  Lowell v. Twin Disk, Inc., 527 F.2d 767, 769–70 (2d. Cir. 1975).  Here, Defendant argues that the TMSA intended to incorporate the six other "marketplace" agreements because the G-3 warrant, expressly incorporated into the TMSA, contains a reference to one of the "marketing" agreements for the purpose of defining the term "qualified revenue" within the context of the TMSA.

Although Defendant argues that the issues of ambiguity and integration should be determined by a finder of fact, here, the Court finds that the TMSA is not ambiguous, and clearly was not intended to incorporate other outside agreements.  Indeed, the TMSA expressly describes the documents intended to be integrated with the TMSA in order to avoid ambiguity.  That one of the attached warrants refers to an outside document in defining a term relevant to the warrant is not evidence that the parties intended to incorporate the document referred to, let alone five other documents to which the TMSA never makes reference.

In considering Plaintiff's breach of contract claim, the Court finds that the TMSA contract does not incorporate the other "market alliance" agreements.  Therefore, the Court agrees with

7

1   Plaintiff, that Defendant cannot look to PurchasePro's performance under the separate "strategic

2   alliance" agreements "as a basis for avoiding its obligations under the TMSA." (Pl.'s Opp. at 3.)

3       **b.Defendant's Breach of Contract**

4       As stated above, Plaintiff's Complaint seeks partial summary judgment on the issue of

5   liability relative to his first claim that Defendant breached the TMSA contract.

6       Under the TMSA contract, Defendant was obligated to develop and deliver certain training

7   and marketing services to PurchasePro having a value of no less than $40 million during the two-year

8   period of the TMSA.  Specifically, Gateway was required to provide the following: (a) a

9   "PurchasePro desktop icon that provided access to the Global Marketplace on no less than 3 million

10  computer systems shipped by Defendant to small and medium-sized business (TMSA § 2(B)); (b)

11  promotional materials related to the Global Marketplace included with computers shipped to small

12  and medim-sized businesses (TMSA § 2(A)); (c) a logo and link to the Global Marketplace from the

13  gateway.com website (TMSA § 2(A)); (d) email blasts to Defendant's small and medium-sized

14  business customers announcing the Gateway Marketplace to be powered by PurchasePro (TMSA §

15  2(A)); and (e) advertising the Global Marketplace products and services in Defendant's catalogs sent

16  to small and medium-sized businesses on a quarterly basis. (TMSA § 2(B)).  Lehtonen argues that

17  Gateway failed to perform its obligations under the TMSA contract *inter alia* by failing to provide 3

18  million desktop icons and promotional materials.

19      The undisputed facts of this case demonstrate that Defendant failed to provide the marketing

20  and services required under the TMSA.  Particularly, Defendant has never alleged that it performed

21  its obligations under the TMSA, but instead argues various affirmative defenses it claims excuse its

22  non-performance.  The only evidence that Defendant performed under the TMSA comes from the

23  deposition testimony of Ajit Sivadasan ("Sivadasan"), stating that Gateway provided Purchase Pro

24  with certain "Phase I" and "Phase II" marketing services identified in the TMSA.  (See Def's Opp.

25  At 13l Ex. J at 161–162, 166–167, 187–188.)  Specifically, and according to Sivadasan, Defendant

26

8

1  placed approximately 30,000 of the required 3 million desktop icons on computers to be shipped to

2  small and medium-sized business customers.

3      Although Defendant has provided proof that it partially performed under the TMSA, the

4  evidence and arguments clearly demonstrate that Gateway did not fulfill its obligations set forth

5  under the TMSA contract.  The Court must now examine whether Gateway's breach is excused by

6  any of its asserted affirmative Defenses.

7          **2. Gateway's Motion and Affirmative Defenses**

8      Defendant seeks to avoid liability under the TMSA under several theories.  Generally,

9  Defendant alleges that PurchasePro breached the TMSA—both expressly and impliedly—by (1)

10 failing to implement the global marketplaces under the strategic alliance agreements; (2) failing to

11 mitigate its damages; (3) breach of the implied covenant of good faith and fair dealing; and (4)

12 frustration of purpose.

13         **a. Plaintiff's Express Breach**

14     Gateway argues that as part of the strategic alliance between the parties PurchasePro was

15 required to develop three different marketplaces intended to generate revenue for both Gateway and

16 PurchasePro.  Gateway claims that PurchasePro failed to meet its contractual obligation relative to

17 these marketplaces in that there were "serious problems" with PurchasePro's software, and because

18 two of the marketplaces were never implemented.  (See Def.'s Opp. at 18.)  Plaintiff argues that by

19 failing to implement the marketplaces, Defendant breached the TMSA, because the "strategic

20 alliance" and "global marketplace" agreements are integrated with the TMSA.

21     As discussed above, the TMSA is clear and unambiguous in that it does not integrate the

22 "marketplace" or "strategic alliance" agreements.  According to the TMSA agreement, PurchasePro

23 was only required to provide the warrants, which it did.  Therefore, Gateway's argument that it may

24 be excused from performance fails as a matter of law.

25

26

**b. Implied Covenant of Good Faith and Fair Dealing**

Gateway's Motion for Summary Judgment and Opposition both argue that Gateway may be excused from performance (or non-performance) under the TMSA because PurchasePro breached the implied covenant of good faith and fair dealing by "engaging in conduct that adversely affected the value of the warrants it provided." (See Def.'s Mot. for Summ. J. at 20.)  Specifically, Gateway contends that the alleged fraudulent and criminal activity of PurchasePro officers adversely affected the value of PurchasePro's stock and violated the implied covenant of good faith and fair dealing by (1) frustrating the purpose of the TMSA, and (2) causing the failure of consideration of the stock warrants.

***i. Frustration of Purpose***.

The doctrine of frustration of purpose excuses performance in cases of extreme hardship. According to the authoritative Second Circuit,

> Frustration of purpose . . . focuses on events which materially affect the consideration received by one party for his performance.  Both parties can perform but, as a result of unforeseeable events, performance by party X would no longer give party Y what induced him to make the bargain in the first place.  Thus frustrated, Y may rescind the contract.  Discharge under this doctrine has been limited to instances where a virtually cataclysmic, wholly unforeseeable event renders the contract valueless to one party.

United States v. General Douglas MacArthur Senior Village, 508 F.2d 377, 381 (2d Cir. 1974).  The frustration of purpose defense is not available if the defendant is deemed to have assumed the risk that its purpose in accepting the bargained-for consideration would be frustrated.  VJK Productions, Inc. v. friedman/Meyer Productions, Inc., 565 F.Supp. 916, 921 (S.D.N.Y. 1983).  Moreover, unlike the defense of  impossibility, the doctrine of commercial frustration, warranting the recision of a contract, is a defense where both parties can perform the contract but, as a result of unforeseeable events, performance by one party would no longer give the other party the benefit that induced him/her to make the contract in the first place.  New York State Elec. & Gas Corp. v. Saranac Power Partners L.P., 117 F. Supp. 2d 211 (N.D. N.Y. 2000), decision aff'd, 267 F.3d 128 (2d Cir. 2001).

1    Defendant argues that it should be excused from performance under the TMSA because the

2    fraudulent acts of PurchasePro officers prior to and during Gateway's dealings with PurchasePro

3    inflated the stock price, and then, brought about the ultimate decrease in stock value, making the

4    warrants worthless.

5    Here, the Court, while sympathetic to the plight of seeing something of value diminish under

6    any circumstance, cannot allow Defendant to escape liability under the doctrine of frustration of

7    purpose.  As stated above, the frustration of purpose doctrine can only be used as a defense when an

8    unforeseeable or fortuitous event supervenes to bring about the failure of consideration.  Here,

9    although it is true that Defendant could not have foreseen the alleged fraud that occurred with

10   PurchasePro, the risk that stock warrants may decrease in value is a foreseeable risk.  Furthermore,

11   Defendant has not provided sufficient proof that PurchasePro's alleged fraud was the proximate

12   cause of its stock value decline.

13   In Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005), the Supreme Court found that

14   "[a] inflated purchase price itself will not constitute or proximately cause the relevant economic loss

15   needed to allege and prove 'loss causation.'"  Id.  In Dura , the Court explained its reasoning as

16   follows,

17       For one thing, as a matter of pure logic, at the moment the transaction takes place, the
         plaintiff has suffered no loss; the inflated purchase payment is offset by ownership
18       of a share that *at that instant* possesses equivalent value.  Moreover, the logical link
         between the inflated share purchase price and any later economic loss is not invariably
19       strong.  Shares are normally purchased with an eye toward a later sale.  But if, say, the
         purchaser sells the shares quickly before the relevant truth begins to leak out, the
20       misrepresentation will not have led to any loss.  If the purchaser sells later after the
         truth makes its way into the marketplace, an initially inflated purchase price *might*
21       mean a later loss.  But that is far from inevitably so.  When the purchaser
         subsequently resells such shares, even at a lower price, **that lower price may reflect,**
22       **not the earlier misrepresentation, but changed economic circumstances, changed**
         **investor expectations, new industry-specific or firm-specific facts, conditions, or**
23       **other events, which taken separately or together account for some or all of that**
         **lower price.**  (The same is true in respect to a claim that a share's higher price is lower
24       than it would otherwise have been-a claim we do not consider here.)  Other things
         being equal, the longer the time between purchase and sale, the more likely that this is
25       so, *i.e.,* the more likely that other factors caused the loss.

26   Given the **tangle of factors affecting price**, the most logic alone permits us to say is

that the higher purchase price will *sometimes* play a role in bringing about a future loss.  It may prove to be a necessary condition of any such loss, and in that sense **one might say that the inflated purchase price suggests that the misrepresentation (using language the Ninth Circuit used) "touches upon" a later economic loss.** *Ibid.* **But, even if that is so, it is insufficient. To "touch upon" a loss is not to** *cause* **a loss, and it is the latter that the law requires.**

Id. at 1631–32 (emphasis added).

Also informative here, is the Supreme Court's reasoning in Dura Pharmaceuticals, that private securities fraud actions may be rooted in and closely resemble common law deceit and misrepresentation actions.  Id. at 1632.  Here, although Defendant is not bringing a private cause of action for securities fraud, but is instead arguing an affirmative defense, the Court finds the element of causation necessary to be eligible for an excuse of performance defense.

Here, Plaintiff has presented undisputed factual evidence regarding the value of PurchasePro's stock in relation to other dot.com companies as well as overall market figures during the time relevant to this case.  Furthermore, though it is undisputed that PurchasePro officers admittedly engaged in fraudulent behavior, Defendant cannot prove—beyond inference—that PurchasePro officers committed any fraud or other bad acts in relation to PurchasePro's business dealings with Gateway.[3]  The Court does not turn a blind eye to the allegations that PurchasePro's officers' fraudulent behavior had some effect on PurchasePro's stock value, however, given the evidence before it, the Court cannot find that said allegations were the proximate cause of Defendant's loss.

For this reason, and because the devaluation of PurchasePro's stock value was not unforeseeable, Defendant's claim for excuse pursuant to allegations of PurchasePro's fraud fail as a matter of law.

---

[3]See Court Order of August 27, 2007, wherein the Court denied Plaintiff's Motion to Exclude Deposition Testimony of PurchasePro officials.  The Court ruled to allow admission of information regarding deposition and prior testimony wherein PurchasePro officials' refused to answer questions regarding PurchasePro's relations with Gateway.

1    ### ii. Failure of Consideration

2    Defendant claims that the warrants provided by PurchasePro to Gateway as consideration

3    "failed due to the illegal and improper activity of the PurchasPro officers." (Def.'s Reply in Support

4    of Summ. J. at 12.)  As discussed above however, Defendant is unable to prove that the alleged

5    fraudulent actions of PurchasePro officers were the proximate cause of the devaluation of Gateway's

6    consideration.  Furthermore, the undisputed evidence demonstrates that the warrants PurchasePro

7    provided Defendant had an estimated value between $36 - $38.2 million.  (See Pl.'s Resp. at 22.)

8    Thus, the Court finds the consideration given in the form of PurchasePro's stock warrants was valid

9    consideration.

10   ### c. Failure to Mitigate

11   A party injured by a breach of contract is required to make a reasonable effort to mitigate its

12   damages.  Tynan Incinerator Co. Inc. v. Internat'l Fidelity Ins. Co., 117 A.D.2d 796, 797 (NY 1986).

13   However whether a party acted reasonably to mitigate its damages is a question of fact for the jury.

14   Defendant argues that Plaintiff should not be awarded summary judgment on his motion for

15   breach of contract because Plaintiff has previously admitted that PurchasePro officers failed to

16   enforce the TMSA in breach of their obligation to preserve corporate assets.  Defendant also claims

17   that PurchasePro failed to mitigate because it allegedly never informed Defendant of their breach, or

18   attempted to collect the owed marketing or services.

19   Here, the Court is not persuaded by Defendant's argument.  Plaintiff has sufficiently

20   demonstrated through testimony of Sonny Barton, that PurchasePro made some effort at mitigation,

21   including giving Defendant notice of non-performance.  (Pl.'s Opp. Ex. 8 pp. 116–26.)  Furthermore,

22   evidence of mitigation will be allowed to be presented to a jury for consideration regarding the

23   extent, if any, of Plaintiff's damages.

24   ### IV. Turnover of Property

25   Plaintiff also seeks summary judgment that in the event damages are awarded Plaintiff at

26   trial, any damages awarded will be turned over so that Plaintiff can avoid the expense of setting out

13

1  all of the bankruptcy pleadings for the purpose of showing that he will be the proper party to collect
2  the damages and distribute them.
3      Finding no argument contrary to Plaintiff's request, the Court hereby grant's Plaintiff's
4  motion.
5  **V. Conclusion**
6      For the reasons stated herein, the **IT IS HEREBY ORDERED** that Defendant's Motion for
7  Summary Judgment (#135) is **DENIED**.
8
9      **IT IS FURTHER ORDERED**, that Plaintiff's Motion for Summary Judgment (#134) is
10  **GRANTED in part** as to his first Claim for breach of contract.
11
12      **IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (#134) is
13  **GRANTED in part** as to Plaintiff's third claim for turnover of property.
14
15      **IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (#134) is
16  **GRANTED in part** as to Defendant's affirmative defenses 1, 3, 10, 16, 17, 18, 19.[4]
17
18      DATED this 30th day of September, 2007
19
20
21  _____
22  Kent J. Dawson
   United States District Judge
23
24
25
26  [4]The court will not consider Plaintiff's Motion for Summary Judgment regarding Defendant's remaining affirmative defenses at this time.

14